IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BELAIR MOTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 04-1924 |
| | ) | |
| v. | ) | Judge Terrence F. McVerry |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| UNIVERSAL UNDERWRITERS | ) | |
| INSURANCE COMPANY, | ) | Docket No. 4 |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

**I. RECOMMENDATION**

It is respectfully recommended that Defendant, Universal Underwriters Insurance Company's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 4) should be granted.

**II. REPORT**

Plaintiff, Belair Motors, Inc., t/d/b/a Toyota of Greensburg (hereinafter "Belair"), instituted this declaratory judgment action in the Court of Common Pleas of Allegheny County, Pennsylvania, on or about December 1, 2004, against Defendant, Universal Underwriters Insurance Company (hereinafter "Universal"), seeking a declaration as to the rights and obligations of the parties under a commercial general liability insurance policy.   Defendant Universal removed the declaratory judgment action to the United States District Court for the Western District of Pennsylvania on December 23, 2004, on the basis of diversity jurisdiction. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 1441(b).  Venue in this District is proper under 28 U.S.C. § 1441(a).

The issue presented here is whether under the commercial general liability insurance policies in effect on the relevant dates, Defendant has a duty to defend Belair in an underlying action wherein Belair is accused of intentionally interfering with existing and prospective contractual relations and violating the Pennsylvania Board of Vehicles Act, 63 P.S. § 818.1 *et seq.*  For the reasons set forth below, the Court finds that Defendant has no duty to defend Belair and therefore, recommends that Defendant's motion to dismiss be granted.

### A.    Motion to Dismiss  - Standard of Review

In ruling on a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court is required to accept as true all allegations made in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the plaintiff.[1] *See Blaw Knox Ret. Income Plan v. White Consol. Indus. Inc.*, 998 F.2d 1185, 1188 (3d Cir. 1993); *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 871 (3d Cir. 1992).  The issue is not whether the plaintiff will ultimately prevail, but rather whether "plaintiff can prove any set of facts consistent with the averments of the complaint which would show the plaintiff is entitled to relief." *See Gaines v. Krawczyk,* 354 F.Supp. 2d 573, 576 (W.D.Pa. 2004) (citing *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1261 (3d Cir. 1994)).  Dismissal is appropriate "only if it is clear that no relief could be granted under any set of facts that could be proven consistent with the allegations." *See Port Auth. of New York and New Jersey v. Arcadian Corp.*, 189 F.3d 305, 311

---

[1]Nonetheless, a court is not required to credit bald assertions or legal conclusions in a complaint when deciding a motion to dismiss. *Gaines v. Krawczyk,* 354 F.Supp. 2d 573, 576 (W.D.Pa. 2004) (citing *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997)).  Consistently, the courts have rejected "'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law' or 'sweeping legal conclusions cast in the form of factual allegations'"[,] in deciding a motion to dismiss pursuant to Rule 12(b)(6). *Id.* (citing *Morse,* 132 F.3d at 906 n. 8 (citing Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure,* § 1357 (2d ed. 1997)); *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir. 1996); *Fernandez-Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir. 1993)).

2

(3d Cir. 1999) (quoting *Alexander v. Whitman*, 114 F.3d 1392, 1397 (3d Cir. 1997)); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir. 2000). Thus, under this standard, a complaint will withstand a motion to dismiss if it gives the defendant adequate notice of the essential elements of a cause of action. *Gaines*, 354 F.Supp. 2d at 576 (citing *Nami v. Fauver*, 82 F.3d 63, 66 (3d Cir. 1996)).

Courts generally consider only the allegations of the complaint, attached exhibits, and matters of public record in deciding motions to dismiss. *Pension Benefit Guar. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Factual allegations within documents described or identified in the complaint may also be considered if the plaintiff's claims are based upon those documents. *Id.* (citations omitted). A district court may consider these documents without converting a motion to dismiss into a motion for summary judgment.[2] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

**B.     Facts and Procedural History**

The facts, viewed in the light most favorable to Plaintiff, are stated as follows. Plaintiff, Belair Motors, Inc., is incorporated in the Commonwealth of Pennsylvania and has a principal place of business in Greensburg, Pennsylvania. (Complt. ¶ 1.) Belair trades and does business as Toyota of Greensburg. (*Id.*) Defendant is incorporated under the laws of Kansas with its

---

[2]In its Complaint in the case at bar, Plaintiff refers to certain factual allegations contained in the complaint filed against Toyota of Greensburg and others by Rohrich Imports, Inc. and related entities, in the Court of Common Pleas of Westmoreland County, Pennsylvania, on or about February 3, 2003 at Docket No. 148 of 2003. Clearly, the Court cannot make a ruling on the merits of Belair's claims in this declaratory judgment action without examining the complaint in the Rohrich action. *General Accident Ins. Co . of America v. Allen*, 547 Pa. 693, 706, 692 A.2d 1089, 1095 (1997) (in a declaratory judgment action regarding insurance coverage, the court must examine the complaint in the underlying action to determine if the factual allegations support a recovery covered by the policy and therefore, a duty to defend on the part of the insurer). Accordingly, the Court finds that under *Pension Benefit Guar. v. White Consol. Indus., Inc.*, it may consider the factual allegations in the complaint filed in the Rohrich action (attached to Defendant's Brief in Support of its Motion to Dismiss) without converting the motion to dismiss to a motion for summary judgment.

principal place of business in Kansas.[3]  (Notice of Removal ¶ 10.)

On or about April 1, 2001, Universal issued to Belair and other related persons and entities a commercial general liability policy, Policy No. 224980 ("2001 Policy"), which covered the period from April 1, 2001 to April 1, 2002.  (Complt. ¶ 3.)  The 2001 Policy was renewed for the period April 1, 2002 to April 1, 2003 under Policy No. 224980A ("2002 Policy").  (Complt. ¶ 4.)  Belair was an insured under the 2001 Policy and 2002 Policy (collectively the "Policies").  (Complt. ¶ 5.)  Belair contends that the Policies were in full force and effect at the time of the events alleged in the complaint filed in the Rohrich action.  (Complt. ¶ 13.)

The Policies contain a Garage Operations and Auto Hazard Coverage Part with a limit of liability of $500,000.00 per occurrence.  Both Policies contain identical insuring agreements, which provide in relevant part:

> We will pay all sums the INSURED legally must pay as DAMAGES[4]
> (including punitive DAMAGES where insurable by law) because of
> injury[5] to which this insurance applies caused by an OCCURRENCE[6]

---

[3]Defendant is licensed by the Pennsylvania Insurance Department to conduct insurance business in Pennsylvania and maintains an office in Pittsburgh, Pennsylvania, from which it regularly conducts business. (Complt. ¶ 2.)

[4]The term "damages" is defined under the Policies to mean "amounts awardable by a court of law" but does not include "civil penalties, fines or assessments." *See* 2001 Policy, Coverage Part 500 at 39; 2002 Policy, Coverage Part 500 at 39.

[5]The term "injury" is defined separately in each of six Injury Groups set forth in the Policies.  With regard to Injury Group 1 (Bodily Injury/Property Damage), "injury" means "bodily injury, sickness, disease or disability (including death resulting from any of these) or damage to or loss of use of tangible property".  As to Injury Group 2 (Mental Injury), injury is defined as "mental anguish, mental injury, fright, shock, or humiliation, except when arising from DISCRIMINATION".  Regarding Injury Group 3 (Personal Injury), injury means "false arrest, false imprisonment, wrongful eviction, wrongful detention, malicious prosecution, abuse of process, libel, slander, defamation of character, private nuisance (except pollution), invasion of rights of privacy or possession of personal property".  With regard to Injury Group 4 (Advertising Injury), injury means "plagiarism, misappropriation of advertising ideas or style, infringement of copyright, title slogan or trademark".  As to Injury Group 5 (Employee Benefits), injury is defined as "any error or omission in the ADMINISTRATION of YOUR profit sharing, pension or employee stock subscription plans or YOUR group life, group hospitalization or major medical, group accident and health, Worker's Compensation, unemployment, social security or disability benefits insurance".  Regarding

4

arising out of GARAGE OPERATIONS or AUTO HAZARD.

(Complt. ¶ 6 (citing 2001 Policy, Coverage Part 500 at 39; 2002 Policy, Coverage Part 500 at 39).)

The term "garage operations" is defined as "the ownership, maintenance or use of that portion of any

premises where YOU conduct YOUR AUTO business and all other operations necessary or

incidental thereto." (Complt. ¶ 6 (citing 2001 Policy, Coverage Part 500 at 40; 2002 Policy,

Coverage Part 500 at 40).)  The Policies further provide that Universal has "the right and duty to

defend any SUIT asking for these DAMAGES." (Complt. ¶ 7 (citing 2001 Policy, Coverage Part

500 at 40; 2002 Policy, Coverage Part 500 at 40).)  However, the Policies also provide that Universal

has "no right or duty to defend SUITS for DAMAGES not covered by or declared for this Coverage

[Garage Operations] Part."  2001 Policy, Coverage Part 500 at 39; 2002 Policy, Coverage Part 500

at 39.  Finally, particularly relevant to this case, Exclusion (b) in the Policies provides that coverage

does not apply to "any act committed by or at the direction of the INSURED with intent to cause

harm.  This exclusion does not apply if INJURY arises solely from the intentional use of reasonable

force for the purpose of protecting persons or property." (*See* 2001 Policy, Coverage Part 500 at 42;

2002 Policy, Coverage Part 500 at 42.)

On or about February 3, 2003, Rohrich Imports, Inc. and related entities (the "Rohrich

plaintiffs")  filed a civil action against Toyota of Greensburg and William J. Owens, Jr., t/d/b/a

---

Injury Group 6, injury means "DISCRIMINATION." *See* 2001 Policy, Coverage Part 500 at 40; 2002 Policy,
Coverage Part 500 at 40.  It is not clear from either the Complaint in this case or Defendant's Motion to Dismiss
which Injury Group is implicated, if any, by the factual allegations in the Underlying Action.  However, Defendant
has not raised this issue in its motion to dismiss and/or brief in support thereof, and therefore, the Court declines to
consider that issue.

[6]With regard to Injury Groups 1 and 2, the term "occurrence" is defined as "an accident, including
continuous or repeated exposure to conditions, which results in such INJURY. . . during the Coverage Part period
neither intended nor expected from the standpoint of a reasonably prudent person."  With regard to Injury Groups 3,
4, 5, and 6, occurrence means "acts of the INSURED during the Coverage Part period which result in such
INJURY." *See* 2001 Policy, Coverage Part 500 at 41; 2002 Policy, Coverage Part 500 at 41.

Toyota of Greensburg ("Owens") (collectively "Toyota defendants"), in the Court of Common Pleas of Westmoreland County, Pennsylvania, at Docket No. 148 of 2003 (the "Rohrich Action" or "underlying action").[7] (Complt. ¶ 8.) In the Rohrich action, the plaintiffs assert three claims against the Toyota defendants,[8] titled: "Interference with Existing Contractual Relations" (Count I),[9] "Interference with Prospective Relations" (Count II),[10] and "Violation of the Board of Vehicles Act" (Count III).[11] (Underlying Complt. at pp. 7, 9-10.) In support of these claims, the Rohrich plaintiffs aver that they hold an exclusive license to sell new Lexus automobiles in Western Pennsylvania, while defendants are not licensed dealers of, nor authorized to sell, new Lexus automobiles in Western Pennsylvania. (Complt. ¶ 10; Underlying Complt. ¶.) The Rohrich plaintiffs further allege that the unlawful conduct occurred for some time prior to March of 2002, as well as after March 13,

---

[7]Toyota of Greensburg and Owens are both insureds under Universal's Policies. (*See* 2001 Policy, Declarations Page 1-A; 2002 Policy, Declarations Page 1-A.) The Rohrich plaintiffs also named a third defendant, Lash Motors, Inc. ("Lash"), in their complaint; however, Lash is not an insured under the Universal Policies.

[8]Belair contends that the claims alleged by the Rohrich plaintiffs in the underlying action arose out of its "garage operations." (Complt. ¶ 12.)

[9]In Count I, the Rohrich plaintiffs aver *inter alia* that the Toyota defendants "knowingly and intentionally interfered with the exclusivity provisions of the Rohrich [plaintiffs'] Franchise Agreements by selling, brokering or offering to act as sellers or brokers for customers of new Lexus automobiles generally and at locations other than Lash's authorized location." (Underlying Complt. ¶ 32.) The Rohrich plaintiffs further aver that the Toyota defendants "acted with the purpose or intent to harm the Rohrich [plaintiffs] by interfering with the Rohrich [plaintiffs'] contractual franchise relationship with Lexus." (Underlying Complt.¶ 33.)

[10]In Count II, the Rohrich plaintiffs aver *inter alia* that the Rohrich plaintiffs "possess prospective contractual relations with purchasers and prospective purchasers of new Lexus vehicles in Western Pennsylvania", and that the Toyota defendants "have purposely and intentionally harmed the Rohrich [plaintiffs] by preventing the Rohrich [plaintiffs] from consummating sales by the brokering of new Lexus automobiles in direct contravention of law securing customers whose normal and customary buying habits." (Underlying Complt.¶¶ 37-38.)

[11]In Count III, the Rohrich plaintiffs allege that the Toyota defendants violated the Pennsylvania Board of Vehicles Act by engaging in conduct prohibited under the Act, including selling or brokering of new Lexus vehicles without having obtained a license to do so. (Underlying Complt.¶ 42.)

2002.[12] (Underlying Complt. ¶¶ 21, 24.)

In February of 2003, Belair forwarded a copy of the complaint in the Rohrich action to Universal and requested that Universal assume Belair's defense and indemnify it against any damages that may be awarded in that action. (Complt. ¶ 14.) Universal subsequently denied any duty to defend or indemnify Belair in connection with the Rohrich action. (Complt. ¶ 15.) As a result, Belair contends it was forced to defend itself in the Rohrich action and in doing so, has incurred significant costs. (Complt. ¶ 16.)

On or about December 1, 2004, Belair filed the instant lawsuit, setting forth three causes of action: (1) Declaratory judgment, (2) breach of contract, and (3) bad faith in violation of 42 Pa.C.S.A. § 8371. In response, Universal filed a motion to dismiss and supporting brief. Belair filed a response in opposition to Universal's motion to dismiss. The motion to dismiss is now ripe for determination.

C.      Discussion

The thrust of Universal's argument in support of its motion to dismiss is that the claims of interference with existing and prospective contractual relations, as alleged in Counts I and II of the underlying complaint, require proof of intentional acts as well as proof of intent to cause the resulting harm in order to recover damages. Therefore, Universal maintains the unlawful conduct alleged in Counts I and II falls within the intended harm exclusion of the Policies. With regard to the alleged violation of the Pennsylvania Board of Vehicles Act contained in Count III of the underlying complaint, Universal argues that the alleged misconduct, *i.e.,* failure to obtain appropriate

---

[12]In correspondence dated March 13, 2002, counsel for the Rohrich plaintiffs advised the Toyota defendants that their use of the Lexus trademarks and service marks to solicit sales and service customers was improper and unlawful, and requested that they cease and desist from such conduct. (Underlying Complt. ¶ 23.)

licenses to conduct automotive-related business in Pennsylvania, is not encompassed within the definition of a covered "injury" under the Policies, and therefore, no coverage exists for this claim.[13] Accordingly, Universal contends it has no duty to defend Belair or indemnify it for any damages awarded in the Underlying Action.

Belair, on the other hand, argues that a claim of tortious interference requires a lesser showing of intent than that necessary to invoke the intended harm exclusion. In particular, Belair contends the exclusion applies only if the insured has a specific intent to harm, while claims of tortious interference with contracts may be established upon proof that Belair merely had a general intent to interfere. Therefore, Belair maintains that the claims asserted against it in the Rohrich action fall within the scope of coverage provided by the Policies, and Universal is obligated to honor its duty to defend it.[14]  (Pl.'s Brief in Resp. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Brief") at 1-2, 7.)

A federal court exercising diversity jurisdiction is required to apply the substantive law of the forum state. *Covington v. Continental Tire, Inc.,* 381 F.3d 216, 218 (3d Cir. 2004); *Highlands*

---

[13]Belair does not address Universal's argument that the misconduct alleged in Count III of the underlying complaint is not a covered injury under the Policies. The Court views Belair's failure to address this argument as conceding the point. A review of the factual allegations in Count III shows that all of the alleged misconduct involved failure to obtain appropriate licenses as required by the Board of Vehicles Act. It does not appear that the alleged violations fall within any of the covered injury groups in the Policies. Accordingly, Universal correctly determined that no coverage existed under the Policies for the alleged violations of the Board of Vehicles Act.

[14]Initially, Plaintiff argues that because Universal attached a copy of the underlying complaint in the Rohrich action to its Brief in Support of the Motion to Dismiss, and said document was neither appended to Belair's Complaint in the instant case nor incorporated by reference, Universal's motion to dismiss should be converted to a Motion for Summary Judgment. Concomitantly, Belair submits the Court must give it, as the non-moving party, an opportunity to present evidence in support of its claims. (Pl.'s Brief at 5-6.)  For the reasons set forth in Note 2, *supra,* the Court finds no merit to this argument. Moreover, Plaintiff does not indicate what additional evidence it believes is necessary to support its claims in this declaratory judgment action. The Court will not allow Plaintiff to litigate the merits of the underlying action in this federal case, as principles of comity and abstention prevent this Court from interfering with the jurisdiction of the Court of Common Pleas of Westmoreland County over that case. *See Younger v. Harris,* 401 U.S. 37 (1971). Therefore, the Court does not see the need to allow Plaintiff to convert Universal's motion to dismiss into a motion for summary judgment.

8

*Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir. 2004) (citing *Erie R.R. v. Tompkins,* 304

U.S. 64, 78 (1938)).  Thus, Pennsylvania law governs the legal issue presented here.

In Pennsylvania, the law with regard to the interpretation of an insurance contract is well

established.  Generally, the task of interpreting an insurance contract is for the court rather than the

jury. *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 469 A.2d 563, 566 (Pa. 1983).  The

Supreme Court in *Standard Venetian* opined on this task as follows:

> The goal of that task is, of course, to ascertain the intent of the parties
> as manifested by the language of the written instrument.  Where a
> provision of a policy is ambiguous, the policy provision is to be
> construed in favor of the insured and against the insurer, the drafter
> of the agreement.  Where, however, the language of the contract is
> clear and unambiguous, a court is required to give effect to that
> language.

*Id.*  "A provision of an insurance contract is 'ambiguous' if reasonably intelligent people could

differ as to its meaning." *Pa. Nat'l Mut. Cas. Ins. Co. v. Traveler's Ins. Co.,* 592 A.2d 51, 54

(Pa.Super. 1991).

Initially, in a declaratory judgment action involving an insurance coverage dispute, the court

must determine the scope of coverage under the applicable insurance policy. *General Accident Ins.*

*Co. v. Allen,* 547 Pa. 693, 692 A.2d 1089, 1095 (1997).  After making this determination, the court

then examines the complaint in the underlying action to ascertain whether coverage is triggered. *Id.*

An insurance company's duty to defend an action against its insured is determined solely by the

allegations in the underlying complaint. *Id.* at 704, 692 A.2d at 1094 (citation omitted); *see also Erie*

*Ins. Exch. v. Fidler,* 808 A.2d 587, 590 (Pa.Super. 2002) (citing *United Services Auto. Ass'n v.*

*Elitzky,* 358 Pa.Super. 362, 517 A.2d 982, 985 (1986)).  However, the particular cause of action pled

in the underlying complaint is not dispositive of whether an insurer's duty to defend is triggered.

Rather, the Court must look to the factual allegations contained in the underlying complaint. *Fidler,* 808 A.2d at 590 (citing *Mut. Benefit Ins. Co. v. Haver,* 555 Pa. 534, 725 A.2d 743, 745 (1999)); *Scopel v. Donegal Mut. Ins. Co.,* 698 A.2d 602, 605 (Pa.Super. 1997) (citations omitted). To the extent that the underlying complaint alleges an injury that actually or potentially falls within the scope of coverage in the insurance policy, the insurer is required to defend its insured until the claim is confined to a recovery that is outside the scope of the policy. *Fidler,* 808 A.2d at 590 (citing *Germantown Ins. Co. v. Martin,* 407 Pa.Super. 326, 595 A.2d 1172, 1175 (1991)); *Scopel,* 698 A.2d at 605 (citation omitted). A court's interpretation of the insurance policy in making this determination involves a question of law. *Id.* (citing *Germantown Ins. Co.,* 595 A.2d at 1174-75).

The exclusion invoked by Universal to deny a duty to defend and indemnify Belair provides in pertinent part that coverage does not apply to "any act committed by or at the direction of the INSURED *with the intent to cause harm.*" (*See* 2001 Policy, Coverage Part 500 at 42; 2002 Policy, Coverage Part 500 at 42 (emphasis added).) Intended harm exclusions similar to the language of the exclusion in Universal's Policies have been held to exclude coverage "where the insured 'intended to cause a harm of the same general type as that which did occur.'" *Fidler,* 808 A.2d at 589 (quoting *Elitzky,* 517 A.2d at 987.)

In *Elitzky,* the Pennsylvania Superior Court held that an intended harm exclusion, such as the one at issue here, is ambiguous as a matter of law and therefore, must be construed against the insurer. 358 Pa.Super. at 374, 517 A.2d at 989. In so holding, the Superior Court rejected the view that an intended or expected harm exclusion clause requires "specific intent to cause the precise injury which did occur." *Id.* at 373, 517 A.2d at 988 (citations omitted). Instead, the Superior Court opined that such an exclusion will apply only where the insured "inten[ded] to cause a harm of the

10

same general type as that which did occur."[15]  *Id.* at 375, 517 A.2d at 989.  An insured intends to cause a harm if he either desired to cause the consequences of his act or acted knowing that such consequences were substantially certain to result.  *Id.*  In making this determination, it is critical to distinguish intent from recklessness or simple negligence, as neither negligence nor recklessness will preclude coverage under the intended harm exclusion.  *Id.* at 376, 517 A.2d at 989; *Fidler,* 808 A.2d at 590.

Thus, the relevant inquiry here is not whether Belair's alleged conduct/actions were intentional, but rather, whether Belair intended by its conduct to cause injuries of the same general type as that which did occur to Rohrich, as the exclusive franchisees for LEXUS vehicles in western Pennsylvania.

In determining an insured's intent, the courts in Pennsylvania apply a subjective standard. *Wiley v. State Farm Fire and Cas. Co.,* 995 F.2d 457, 460-61 (3d Cir. 1993) (citing *Eisenman v. Hornberger,* 438 Pa. 46, 49, 264 A.2d 673, 675 (1970); and *Elitsky,* 517 A.2d at 987, 989); *see also USX Corp. v. Adriatic Ins. Co.,* 99 F.Supp.2d 593, 630 (W.D.Pa. 2000), *aff'd* 345 F.3d 190 (3d Cir. 2003) (citing *Elitzky,* 517 A.2d at 990).  However, in certain circumstances, this intent may be presumed.  For example, certain intentional torts, such as assault and battery, have been found to demonstrate an intent to produce a general type of harm as a matter of law.  *Fidler,* 808 A.2d at 590-91 (intended harm exclusion applied to bar coverage where insured allegedly threw a fellow junior high school student against a wall and into a desk since court concluded insured's conduct was intentional as a matter of law); *Nationwide Mut. Ins. Co. v. Yaeger,* No. Civ. A. 93-3024, 1994 WL

---

[15]The Pennsylvania Superior Court explained that an "injury of the same general type . . . is a composite of many factors, including [the] nature or character of the injury, magnitude, location, and other factors." *State Farm Fire and Cas. Co. v. Levine,* 389 Pa.Super. 1, 4, 566 A.2d 318, 320 (1989) (internal citations omitted).

447405, *2 (E.D.Pa. Aug. 19, 1994), *aff'd without opin.* 60 F.3d 816 (3d Cir. 1995) (although underlying complaint alleged the insured negligently, carelessly and/or recklessly struck victim with a stick causing eye injury, exclusion applied because complaint failed to state a *prima facie* claim of negligence and undisputed facts indicated only an intention tort); *Germantown Ins. Co. v. Martin, supra* (injuries to victims of a shooting spree in their home were deemed intentional where there was no evidence that the shooting was negligent or accidental and therefore the exclusion applied[16]); *Donegal Mut. Ins. Co. v. Ferrara,* 380 Pa.Super. 588, 593-95, 552 A.2d 699, 701-02 (1989) (where complaint alleged that insured "willfully and maliciously kick[ed police officer] in the groin area, contributing or causing the injuries" specified in the complaint, the insured acted knowing the consequences of her act, *i.e.,* damage to the police officer's genitalia, which would be substantially certain to result from the insured's act); *Humphreys v. Niagara Fire Ins. Co.,* 404 Pa.Super. 347, 356-57, 590 A.2d 1267, 1271-72 (1991) (court held allegations in complaint charging violations of RICO and antitrust laws fell within exclusion of professional liability policy for intentionally fraudulent acts).

An example of a situation where the Superior Court found the resulting damage was not of the same general type as that which the actor intended to cause is found in *Eisenman v. Hornberger.* In that case, the Superior Court held that the intended harm exclusion in a homeowner's policy did not apply where a burglar unintentionally set fire to the house he was burglarizing, because the resulting property damage to the house was not the intended harm of the burglary. In *Eisenman,* a

---

[16]In *Germantown,* the Superior Court held that the injuries caused when the insured fired shots at the victims during a shooting spree were expected or intended and therefore were not covered under the shooter's homeowner's policy. The appellate court reached this conclusion based on evidence to the effect that the insured was proficient with weapons, "chose an automatic handgun, brought extra ammunition, drove to the right house, approached without incident and shot repeatedly each person he saw." 407 Pa.Super. at 333, 595 A.2d at 1175.

juvenile and adult male broke into a residence for the purpose of committing a burglary, while several other juveniles waited outside. During the burglary, one of the thieves lit several matches to allow them to find their way through the house. Unbeknownst to the thieves, one of the dropped matches was not fully extinguished and lodged in a chair cushion. After the thieves departed, the material ignited, resulting in a fire which destroyed the house and its contents. The property owners brought suit against the thieves. One of the juveniles was insured under his father's homeowner's insurance policy. The homeowner's insurer disputed coverage, claiming that the acts committed by its insured were intentional and therefore excluded from coverage. The Pennsylvania Supreme Court disagreed, finding that before an insurer may validly disclaim liability, it must show that the insured intended by his conduct to cause the damage which actually occurred. 438 Pa. at 49, 264 A.2d at 674 (citing 2 A.L.R. 3d 1238 (1965)). On the record before it, the Supreme Court found no evidence that the insured intended to cause property damage in dropping the matches as they burned down to the end.[17] *Id.*

An intent to harm may also be presumed where the insured is held liable for a claim that contains elements which establish an intent to harm, but only where there is no potential liability for recklessness or negligence under the same cause of action brought against the insured.[18] *USX Corp.,*

---

[17]The Pennsylvania Supreme Court's decision in *Eisenman* appears to be predicated, at least to some extent, on the absence of a violation of law clause in the homeowners policy. Recently, the Pennsylvania's highest court had an opportunity to consider the efficacy of its ruling in *Eisenman,* in a situation where the insured committed criminal acts involving Schedule I controlled substances. *See Minnesota Fire & Cas. Co. v. Greenfield,* 855 A.2d 854, 866 (Pa. 2004). In that case, the Pennsylvania Supreme Court carved out a narrow exception to *Eisenman,* holding "in situations when an insured commits a criminal act, with respect to a Schedule I controlled substance, and unintended or unexpected injuries or losses occur as a result, whether by accident or negligence, public policy will not allow coverage under the contract of insurance." *Id.*

[18]Pennsylvania law does not recognize negligent interference with contractual relations. *Valley Forge Convention & Visitor's Bureau v. Visitor's Services, Inc.,* 28 F.Supp.2d 947, 953 (E.D.Pa. 1998) (citations omitted); *Aikens v. Baltimore & Ohio R.R.,* 348 Pa.Super. 17, 501 A.2d 277, 278-79 (1985). The only exception to this rule is where a special relationship exists between the parties. *Valley Forge,* 28 F.Supp. 2d at 953; *Aikens,* 501 A.2d at

99 F.Supp. 2d at 630 (citing *Elitzky,* 517 A.2d at 989). For example, in *Elitzky,* during the course

of litigation commenced in the Court of Common Pleas of Philadelphia County, the Elitzkys accused

the judge presiding over their litigation of engaging in judicial corruption and other improper

conduct. These accusations were made in writing through letters sent to the judge as well as to other

persons and/or government officials not involved in the litigation. Subsequently, the judge filed suit

against the Elitzkys seeking damages for alleged defamatory statements made by them either

knowing that they were false or with reckless disregard for the truth. 358 Pa.Super. at 366, 517 A.2d

at 984. The judge also claimed the Elitzkys made the defamatory statements with the purpose of

intentionally inflicting emotional distress on him. *Id.* Finally, the judge sought punitive damages

for the alleged "malicious, intentional and reckless conduct" of the Elitzkys. *Id.* The Elitzkys sought

coverage from their homeowners' insurance carrier which disclaimed coverage under the policy. In

a declaratory judgment action filed by the Elitzkys, the trial court held the insurance company had

no duty to defend because the judge's causes of action were predicated solely on intentional tort

theories and therefore the judge's alleged damages were excluded from coverage under the policy

as "damage or injury 'intended or expected by the insured.'" *Id.* at 367, 517 A.2d at 985. On appeal,

the Pennsylvania Superior Court reversed, finding that the judge's complaint stated a cause of action

which may be covered by the Elitzkys insurance policy. *Id.* at 376, 517 A.2d at 989. Specifically,

the Superior Court found it was critical to distinguish between intent and recklessness, holding that

---

278-79. "A 'special relationship' is one involving confidentiality, the repose of special trust or fiduciary
responsibilities." 28 F.Supp.2d at 952 (citing *Commw. of Pa., Dep't of Transp. v. E-ZParks, Inc.,* 153 Pa.Commw.
258, 620 A.2d 712, 717 (1993); *Etoll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 22-23 (Pa.Super. 2002)
(citing with approval *Valley Forge, supra*). A special relationship "generally involves a situation where by virtue of
the respective strength and weakness of the parties, one has the power to take advantage or exercise undue influence
over the other." *Valley Forge,* 28 F.Supp.2d at 952 (citations omitted). It is clear from the allegations in the
underlying complaint that no such "special relationship" exists between any of the parties.

in the latter instance, the intent to cause the resulting harm is missing and therefore, the intended

harm exclusion does not apply to disclaim coverage. *Id.* Because the judge's complaint contained

allegations of recklessness with regard to his libel claim, *and* Pennsylvania law recognizes a cause

of action for libel based on reckless disregard for the truth, the Superior Court concluded that the

insurance company had a duty to defend the Elitzkys in the suit filed by the judge. *Id.* at 380, 517

A.2d at 992.

In the instant matter, Universal contends that Belair's intent to harm should be presumed, as

a matter of law, because the allegations in the underlying complaint set forth a cause of action for

interference with existing and prospective contractual relations, which, under Pennsylvania common

law, are intentional torts. In Pennsylvania, the Supreme Court has adopted the Restatement

definition of tortious interference with a contract:

> One who intentionally and improperly interferes with the performance
> of a contract (except a contract to marry) between another and a third
> person by inducing or otherwise causing the third person not to
> perform the contract, is subject to liability to the other for the
> pecuniary loss resulting to the other from the failure of the third
> person to perform the contract.

Restatement (Second) of Torts, § 766 (1979); *Shein v. Myers,* 394 Pa.Super. 549, 555, 576 A.2d 985,

988 (1990) (citing *Adler, Barish, Daniels, Levin and Creskoff v. Epstein,* 482 Pa. 416, 431, 393 A.2d

1175, 1183 (1978)).[19] The Pennsylvania courts have gleaned four distinct elements from the

Restatement definition of a cause of action for tortious interference with existing or prospective

---

[19] The Pennsylvania Supreme Court in *Adler* relied on the definition of tortious interference with contractual relations contained in Section 766 of the Restatement (Second) of Torts (Tent. Draft. No. 23, 1977), which was found to be substantially the same as the final version published in 1979. *Windsor Securities, Inc. v. Hartford Life Ins. Co.,* 986 F.2d 655, 659 & n. 6 (3d Cir. 1993) (citing *Adler, Barish, supra*; *Nathanson v. Med. Coll. of Pa.,* 926 F.2d 1368, 1388 n. 14 (3d Cir. 1991)).

contractual relations:

(1)    [T]he existence of a contractual, or prospective contractual relation between the complainant and a third party;

(2)    purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3)    the absence of privilege or justification on the part of the defendant; and

(4)    the occasioning of actual legal damage as a result of the defendant's conduct.

*Milicic v. Basketball Marketing Co., Inc.,* 857 A.2d 689, 696 n. 4 (Pa.Super. 2004) (quoting *Reading Radio, Inc. v. Fink,* 833 A.2d 199, 211 (Pa.Super. 2003)); *Strickland v. Univ. of Scranton,* 700 A.2d 979, 985 (Pa.Super. 1997) (citations omitted). With regard to intent, the Pennsylvania Superior Court has held that "intent in the context of tort litigation . . . extends both to the desired consequences and to the consequences substantially certain to follow from the act." *Field v. Philadelphia Elec. Co.,* 388 Pa.Super. 400, 416, 565 A.2d 1170, 1178 (1989); *see also* Restatement (Second) of Torts, § 766 (1979), cmt. j. (stating that the definition of "intent" for purposes of intentional interference means the definition employed in Section 8A of the Restatement (Second) of Torts (1965), which provides in relevant part that intent "denotes that the actor desires to cause [the] consequences of his act, or that he believes that the consequences are substantially certain to result from it.")[20] The commentator further notes in comment j. to Section 766 that the requisite intent will be found to exist even when the interference is incidental to the actor's independent purpose and desire, *so long as such interference is known by him to be a necessary consequence of*

---

[20]The Restatement definition of intent with regard to intentional interference with contractual relations is exactly the same as the definition of intent adopted by the Pennsylvania Superior Court in *Elitzky* for purposes of determining whether the insured possessed the requisite intent for triggering the intended harm exclusion.

*his action.* Restatement (Second) of Torts, § 766 (1979), cmt. j. (emphasis added).  However, proof of malice or ill will directed towards the plaintiff is not required to prove intent to cause harm to contractual relations. *Ruffing v. 84 Lumber Co.,* 410 Pa.Super. 459, 469, 600 A.2d 545, 550 (1992); Restatement (Second) of Torts, § 766 (1979), cmts. r. and s.

With regard to the intent element of tortious interference with contracts, recent decisions of the Pennsylvania Superior Court provide that the intent required is "purposeful action . . . *specifically intended* to harm the existing relation, or to prevent a prospective relation from occurring." *Milicic,* 857 A.2d at 696 n.4 (quoting *Reading Radio,* 833 A.2d at 211 (quoting *Strickland,* 700 A.2d at 985)).  However, in two earlier decisions relied on by Belair, *Yaindl v. Ingersoll-Rand Co. Standard Pump-Aldrich Div.,* 281 Pa.Super. 560, 422 A.2d 611 (1980), *abrogated on other grounds in Yetter v. Ward Trucking Corp.,* 401 Pa.Super. 467, 585 A.2d 1022 (1991), and *Ruffing, supra,* the Superior Court held that a specific intent to harm was not required in Pennsylvania in order to sustain a claim for intentional interference with contractual relations.  *Ruffing,* 410 Pa.Super. At 469, 600 A.2d at 550 (citing *Yaindl,* 281 Pa.Super. at 581 n.11, 422 A.2d at 622 n.11)  At first blush, the Superior Court's decisions in *Yaindl* and *Ruffing* appear to be at odds with its later decisions in *Milicic* and *Reading Radio.* However, a close reading of *Yaindl* reveals that the "specific intent" referred to by the Superior Court in that case was the specific intent to cause harm to a particular individual, or in other words, ill will or malice directed towards plaintiff. 281 Pa.Super. at 581 n.11, 422 A.2d at 622 n.11.  Indeed, in its subsequent decisions in *Milicic* and *Reading Radio,* the Superior Court has left intact the requirement of showing a specific intent to cause harm to existing relations, or to prevent a prospective relation from occurring.

Belair attempts to hang its hat on the holdings in *Yaindl* and *Ruffing* that specific intent to

harm is not required to prove the intent element.   In particular, Belair contends that if it is found liable in the Rohrich action, such liability will likely not be based on a specific purpose of harming the Rohrich plaintiffs, but rather, is likely to be based on an intent to earn a profit for itself, and any resulting harm to the Rohrich plaintiffs would be incidental and unintended.   (Pl.'s Brief at 10.) According to Belair, the factfinders in the underlying action are likely to determine that Belair possessed only a general intent, *i.e.,* an intent to arrange for the sale of Lexus automobiles to earn a profit, which sales incidentally harmed the Rohrich plaintiffs, as opposed to a specific intent, *i.e.,* an intent to arrange for the sale of automobiles for the specific purpose of harming the Rohrich plaintiffs. (*Id.*) If its principal motivation was to earn a profit from the sale of Lexus vehicles, then Belair contends its conduct is within the scope of coverage. (*Id.*)

Belair's argument is flawed for several reasons. First, the specific intent described by Belair inaccurately states the intent element for a claim of tortious interference with contractual relations, and it runs afoul of the Superior Court's decisions in *Yaindl* and *Ruffing*. The test is not whether Blair acted with the specific purpose or intent to harm the *Rohrich plaintiffs*, but rather, whether Belair acted with the specific intent to cause harm to the *contractual relations*. Second, Belair may still be found liable to the Rohrich plaintiffs on the tortious interference claims even if it did not intend to harm the Rohrich plaintiffs or did not act for the primary purpose of interfering with the franchise  agreements or desire it, where, for example, Belair was motivated by its own desire to make a profit, *but only if the Rohrich plaintiffs also prove that Belair knew the interference with the Rohrich plaintiffs' exclusive franchise agreements and licenses was certain or substantially certain*

18

*to occur as a result of its actions.*  Restatement (Second) of Torts, § 766 (1979), cmt. j.[21]  (emphasis

added).  Belair's attempt to simply categorize intent as "general" versus "specific" ignores this

critical prerequisite.  Third, the underlying complaint does not allege anything but intentional

conduct on the part of Belair with the intent to harm the franchise agreements.  Finally, the intent

required to recover for tortious interference is exactly the same as that stated by the Superior Court

in *Elitzky* for application of the intended harm exclusion.  Thus, since the same intent is required for

recovery in the underlying action and application of the intended harm exclusion in this declaratory

judgment action, the Court finds no merit to Belair's argument.

Therefore, the intended harm exclusion in Universal's Policies will apply to bar coverage if

the allegations in the underlying complaint, taken as true for purposes of this declaratory judgment

action: (1) potentially set forth a cause of action for tortious interference with existing and

prospective contractual relations, (2) do not implicate any other cognizable claim that potentially

may be covered by Universal's Policies, and (3) allow the Court to conclude as a matter of law that

the intended harm is of the same general type as that which did occur.

This Court finds that the allegations in the underlying complaint potentially set forth a cause

of action for tortious interference with existing and prospective contractual relations.  The underlying

complaint alleges that the Rohrich plaintiffs are the exclusive franchised and licenced dealers for the

sale of new Lexus vehicles in western Pennsylvania.  (Underlying Compl. ¶ 10.)  The underlying

complaint further alleges the Toyota defendants engaged in an unlawful scheme to display, market,

solicit, sell, broker and represent to consumers that they could and did deliver new Lexus vehicles

---

[21]The fact that Belair's interference with the Rohrich plaintiffs' franchise agreements was not desired and
was purely incidental is more appropriately considered in determining whether the interference was improper, and
not in determining intent.  Restatement (Second) of Torts, § 766 (1979), cmt. j.

from an unauthorized, non-franchised facility. (Underlying Compl. ¶ 21.) It is further alleged that

when the Rohrich plaintiffs became aware of such conduct, their counsel sent a cease and desist

letter to the Toyota defendants; however, the Toyota defendants continued to engage in the above

mentioned conduct. (Underlying Compl. ¶¶ 22-24.)    As a result of the actions of the Toyota

defendants, the Rohrich plaintiffs allege they have been deprived of sales and service of new Lexus

automobiles, and have suffered a loss of profits, customer goodwill, business reputation, market

advantage, and damages from the Toyota defendants' interference with their rights under the

franchise agreements. (Underlying Compl. ¶ 26.) With regard to the claim of interference with

existing contractual relations, the underlying complaint specifically alleges that the Toyota

defendants knew or should have known the Rohrich plaintiffs were the only authorized and licensed

franchisees for the sale of new Lexus automobiles in western Pennsylvania. (Underlying Compl. ¶

29.) It is further alleged that none of the Toyota defendants are licensed by the State Board of

Vehicle Manufacturers, Dealers and Salespersons to broker for the sale of new Lexus automobiles,

nor are they franchisees of Lexus. (Underlying Compl. ¶¶ 30-31.) The underlying complaint further

alleges that the Toyota defendants knowingly and intentionally interfered with the exclusivity

provisions of the Rohrich plaintiffs' franchise agreements by selling, brokering, or offering to act

as sellers or brokers for customers of new Lexus automobiles, and that the Toyota defendants so

acted with the purpose or intent to harm the Rohrich plaintiffs, without privilege or justification,

resulting in actual damages. (Underlying Compl. ¶¶ 32-35.) With regard to the claim of interference

with prospective contractual relations, the underlying complaint alleges that the Rohrich plaintiffs

possess prospective contractual relations with purchasers and prospective purchasers of new Lexus

vehicles in western Pennsylvania, as the franchised dealers and licensees. (Underlying Compl. ¶ 37.)

The underlying complaint further alleges that the Toyota defendants purposefully and intentionally harmed the Rohrich plaintiffs by preventing them from consummating sales by the brokering of new Lexus automobiles, and that they so acted without privilege or justification to act as brokers of new Lexus automobiles, and consequently, the Rohrich plaintiffs sustained actual damages. (Underlying Compl. ¶¶ 38-40.) Thus, the Court finds these allegations potentially set forth causes of action for tortious interference with existing and prospective contractual relations.

Moreover, even if the Rohrich plaintiffs are unable to prove the intent element of their tortious interference claims in the underlying action, Universal still has no duty to defend Belair because Pennsylvania does not recognize a cause of action for negligent interference with contracts, and the allegations in the underlying complaint do not implicate any other cognizable claim that potentially may be covered by Universal's Policies. *Elitzky, supra.*

Finally, based on *Yaeger, Fidler, Ferrara,* and *Elitzky,* the Court finds, as a matter of law, that Belair, by interfering with the Rohrich plaintiffs' exclusive franchise agreements and diverting customers to Belair, intended to cause injuries of the same general type as that which did occur. If the allegations in the underlying complaint are taken as true, the alleged actions indicate that Belair intended to interfere with the Rohrich plaintiffs' exclusive franchise agreements. The underlying complaint alleges that the Toyota defendants displayed, marketed, solicited, sold, brokered and represented to consumers that they could and did deliver new Lexus vehicles from an unauthorized, non-franchised facility, knowing that the Rohrich plaintiffs were the exclusive franchisees in western Pennsylvania, *i.e.,* with the intent to harm the franchisee/licensee relationship of Rohrich plaintiffs. The underlying complaint further alleges that as a result of the interference, the Rohrich plaintiffs were deprived of sales and service of new Lexis vehicles that they should have received as exclusive

21

franchisees, and therefore suffered actual damages. It is further alleged that Toyota defendants knew that the Rohrich plaintiffs were the exclusive franchisees/licensees of new Lexus vehicles in western Pennsylvania, yet continued to engage in conduct that interfered with those agreements. Moreover, the Toyota defendants and Lash allegedly engaged in such conduct without a franchise agreement or license of their own. Accordingly, the Court finds that the allegations indicate that Belair either desired to cause the resulting injuries or acted knowing that such injuries were substantially certain to result. Therefore, based on the allegations in the underlying complaint, the Court concludes that Belair acted with the intent to cause injuries of the same general type as that which did occur.

In light of the above findings, the Court concludes, as a matter of law, that the intended harm exclusion in Universal's Policies applies to bar coverage, and therefore, Universal does not owe a duty to defend to Belair in the Rohrich action.[22]

*Breach of Contract/Bad Faith Claims*

Because the Court has concluded that Universal does not have a duty to defend or indemnify Belair in the underlying action, it follows *a fortiori* that Universal has not breached its contract of insurance with Belair, nor is there any basis for finding that Universal acted in bad faith in denying a duty to defend and/or indemnify. Accordingly, it is recommended that these claims likewise be dismissed with prejudice.

---

[22]An insurer's duty to defend is more encompassing than the duty to indemnify. *Scopel,* 698 A.2d at 605 (citations omitted). Thus, once the court has determined that the insurer has no duty to defend the insured in the underlying action, the duty to indemnify is foreclosed. *Id.* Thus, since the Court has found Universal has no duty to defend Belair, it cannot be required to indemnify its insured.

## III.   <u>CONCLUSION</u>

Because the Court has found that Universal has met its burden of proving that the intentional harm exclusion precludes coverage under the Policies, and that no coverage exists under the Policies for the alleged violations of the Pennsylvania Board of Vehicles Act, the Court concludes that Universal has no duty to defend Belair.  In light of this conclusion, Plaintiff's breach of contract and bad faith claims fail as a matter of law.  Accordingly, it is respectfully recommended that Defendant, Universal Underwriters Insurance Company's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) should be granted and the complaint dismissed with prejudice.

In accordance with the Magistrates Act, 28 U.S.C.  § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: July 26, 2005                                    By the Court:

                                                                  Lisa Pupo Lenihan
                                                                  U.S. Magistrate Judge

cc:     Judge Terrence F. McVerry
        United States District Court

        Russell J. Ober, Jr., Esquire
        Chad I. Michaelson, Esquire
        Meyer, Unkovic & Scott
        1300 Oliver Building
        Pittsburgh, PA 15222

Robert E. Dapper, Jr., Esquire
Diane A. Blackburn, Esquire
Dapper, Baldasare, Benson & Kane
Three Gateway Center, Suite 1375
401 Liberty Avenue
Pittsburgh, PA 15222